IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN SNOWDEN, as Plenary Guardian of the Person and Estate of KAHLIF SNOWDEN, INCAPACITATED : : : : | |
| Plaintiff, : | CIVIL ACTION |
| v. : : | NO. 11-5041 |
| CITY OF PHILADELPHIA, et. al. : : | |
| Defendants. : | |

MEMORANDUM

BUCKWALTER, S.J.                                                                October 4, 2012

Currently pending before the Court are the Cross-Motions for Summary Judgment of Plaintiff John Snowden and Defendants City of Philadelphia, Charles Ramsey, Commissioner of the Philadelphia Police Department, Officer Michael Walsh, Officer Robert Shaw, Officer Donald Vandermay, Officer Kevin McNicholas, and Sgt. James Morace, Jr. For the following reasons, Plaintiff's Motion is denied and Defendants' Motion is granted in part and denied in part.

I. **FACTUAL AND PROCEDURAL BACKGROUND**

This matter involves the arrest of Kahlif Snowden on February 18, 2011, during which his airway ended up being obstructed and as a result of which he suffered permanent brain damage. John Snowden, Kahlif's father and Plenary Guardian of the Estate and Person of Kahlif, brings suit on his behalf alleging civil rights violations under § 1983.

On the evening of February 18, 2011, Officers Michael Walsh and Donald Vandermay, along with Sergeant David Armstrong, were working as undercover narcotics officers as part of the Philadelphia Police Department's Narcotics Enforcement Team (NETS) unit. (Defs.' Mot. Summ. J., Ex. B., Written Statements of Officers McNicholas, Walsh, Vandermay, Shaw, and Sgt. Morace ("Officers's Statements").) At approximately 8:00 P.M., the officers were traveling in an unmarked Ford Taurus when they observed Kahlif on the 2900 block of Hartville Street in Philadelphia. (Id.) The officers believed that they observed a hand to hand narcotics transaction taking place between Kahlif and a female. (Id.) Officer Walsh and Sgt. Armstrong exited the car while Officer Vandermay stayed inside. (Defs.' Mot. Summ. J., Ex. D., Deposition of Michael Walsh ("Walsh Dep."), 42:9–19, Jul. 16, 2012.) Officer Walsh announced "police" and told Kahlif to "come here." (Id. at 44:17–45:3.) After Officer Walsh spoke, Kahlif then discarded a pill bottle and began to run away. (Id. at 45:13–15; Defs.' Memo in Opposition to Summ. J., Ex. B., Internal Affairs Interview of David Armstrong.) Officer Walsh began to pursue Kahlif on foot while Officer Vandermay followed from inside the unmarked Ford Taurus. (Id. at 46:2–8; Defs.' Motion for Summ. J., Ex. C, Deposition of Donald Vandermay ("Vandermay Dep."), 73:13–74:22, Jul. 16, 2012.) Kahlif was finally caught by Officer Walsh several blocks away at the corner of Gransback Street and Indiana Avenue, where he was tackled to the ground by Officer Walsh. (Officers's Statements; Walsh Dep. 21:8–22:7.) Shortly thereafter, Officer Vandermay exited the Ford Taurus and assisted Officer Walsh in attempting to apprehend Kahlif. (Vandermay Dep. 77:15–23.)

While attempting to handcuff Kahlif, Officer Vandermay observed Kahlif place what appeared to be a clear plastic bag inside of his mouth. (Id. at 92:23–93:19.) Officer Vandermay

2

believed that the bag contained smaller pink packets containing a white substance. (Id.) Officer Vandermay then attempted to get Kahlif to spit out the bag by grabbing his throat area and pinching the skin underneath the chin for one to two seconds. (Id. at 106:14–21.) Soon thereafter, Officers Robert Shaw, Kevin McNicholas, and William Schlosser, uniformed bicycle officers, arrived at the scene to assist Officers Walsh and Vandermay in apprehending Kahlif. (Officers's Statements; Defs.' Mot. Summ. J., Ex. E, Deposition of Robert Shaw ("Shaw Dep."), 8:14–11:9, Jul. 16, 2012.) All officers present on the scene stated that they were unable to get Kahlif's left hand out from under his body in order to handcuff him. (Officers' Statements; Shaw Dep. 11:3–12:20.) Officer McNicholas instructed Officer Shaw to use his TASER on Kahlif in order to make Kahlif give up his left arm. (McNicholas Dep. 37:2–38:11.) Officer Shaw then announced to Kahlif that he was going to use his TASER device on him. (Id. 39:19–23; Shaw Dep. 37:15–22.) At this point, Officer Shaw took his TASER device and used it in "drive stun mode" on the back of Kahlif's neck.[1] (Id. 38:4–8). According to Shaw, this was done to force Kahlif to give up his left arm. (Id.) Shaw pulled the TASER trigger four times in a span of forty-three seconds, with each trigger pull lasting five seconds. (Defs.' Mot. Summ. J., Ex. F, TASER Report ("Taser Report").) Officer Shaw was aware at the time he used the TASER that Kahlif had something inside his mouth. (Shaw Dep. 12:21–13:5.)

After Shaw used his TASER on Kahlif's neck, Sergeant James Morace arrived on the scene. (Defs.' Mot. Summ. J., Ex. G, Deposition of James Morace ("Morace Dep"),

---

[1]According to Defendants, "Drive stun mode" refers to using the TASER as if it were a stun gun by placing the TASER directly onto the skin of the suspect. This is in contrast to "probe mode," wherein the TASER shoots out two prongs connected to wires which then attach to a person's skin. (Defs.' Motion for Summ. J., Ex. A, Statement of Undisputed Facts ¶ 14 n.2.)

3

19:23–20:18, Mar. 6, 2012.) After Morace's arrival, the officers were finally able to get Kahlif's left hand in handcuffs. (Id. at 22:12–19.) At this point, Kahlif was on his stomach, but was rolled over onto his side afterwards. (Id. at 22:8–19; Vandermay Dep. 124:15–16.) Officer Vandermay then noticed and announced that Kahlif was not breathing. (Vandermay Dep. 124:17–24.) Kahlif was then placed on his back while Officer Shaw began to do chest compressions on him. (Id. at 127:1-7.) Sergeant Morace then broadcast a request over the police radio for the Philadelphia Fire Department's rescue squad to come and assist at the location. (Morace Dep. 25:5–14.)

After approximately "a minute or so," when he did not hear or see any rescue lights, Sergeant Morace decided to transport Kahlif to Temple University Hospital in his patrol vehicle. (Id. at 26:9–24.) He then instructed the police radio dispatcher to alert the hospital that the officers were coming in with an unresponsive male. (Id.) The trip to the hospital took approximately three to five minutes, during which Sergeant Morace had his vehicle's lights and sirens activated. (Id. at 27:19-23; Defs.' Mot. Summ. J. Exh. H., Deposition of Kevin McNicholas ("McNicholas Dep."), 15:2–5, Mar. 6, 2012.) Upon arrival at the hospital, Dr. Gerrard Carroll removed a small plastic bag from Snowden's airway. (Defs.' Mot. Summ. J. Exh. I., Deposition of Gerard Carroll ("Carroll Dep."), 24:6–22, Feb. 27, 2012.) As a result of the airway blockage, Kahlif suffered irreversible anoxic brain damage. (Id. at 45:2–7.)

Plaintiff filed suit on behalf of his son in state court, and Defendants removed the case to federal court on August 5, 2011. Plaintiff brought numerous counts under 42 U.S.C. § 1983 asserting (1) violation of civil rights against all defendants, (2) failure of the City to implement appropriate policies, customs, and practices to prevent officers from making false arrests, using

4

excessive force, and giving proper medical care to detainees, (3) use of excessive force by the officers, (4) false arrest, (5) failure of the officers to provide adequate detainee medical care, (6) negligence, and (7) assault and battery.  Both Plaintiff and Defendants filed Motions for Partial Summary Judgment on August 15, 2012.  Plaintiff and Defendants filed Responses on August 31.  In his response, Plaintiff noted that he was dropping his claims for negligence and dropping all claims against Police Commissioner Charles Ramsey in his individual capacity.

## II.     STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg

Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. Anderson, 477 U.S. at 249–50.

### III. DISCUSSION

Plaintiff moves for summary judgment on its false arrest, excessive force, and inadequate detainee medical treatment claims, Counts III, IV, and V respectively. Defendants move for summary judgment on the municipal liability claim (Count II), on the inadequate detainee

6

medical treatment claim (Count V), and to dismiss all claims against Sergeant James Morace.

    A.    **False Arrest**

Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983. The statute itself does not independently create substantive rights, but rather merely "provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws." Kopec v. Tate, 361 F.3d 772, 775–76 (3d Cir. 2004); see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284–85 (2002); Bush v. Lancaster City Bureau of Police, No. Civ.A.07-3172, 2008 WL 3930290, at *3 (E.D. Pa. Aug. 26, 2008). A plaintiff may bring a § 1983 action if he alleges that a person acting under color of state law deprived him of rights, privileges, or immunities secured by the Constitution or laws of the United States. 42 U.S.C. § 1983. In other words, a plaintiff alleging a § 1983 violation must demonstrate that: (1) the defendants acted under color of [state] law; and (2) their actions deprived [the plaintiff] of rights secured by the Constitution or federal statutes. Anderson v. Davila, 125 F.3d 148, 159 (3d Cir. 1997).

Plaintiff first claims that Defendants are liable under § 1983 for violating the *Fourth Amendment* by arresting Kahlif without probable cause. The United States Supreme Court has characterized probable cause as a "fluid concept—turning on the assessment of probabilities in particular factual contexts— not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). A showing of probable cause thus requires "proof of

7

facts and circumstances that would convince a reasonable, honest individual that the suspected person is guilty of a criminal offense." Lippay v. Christos, 996 F.2d 1490, 1502 (3d Cir. 1993). Although probable cause calls for more than mere suspicion, it does not mandate that the evidence at the time of the arrest be sufficient to prove guilt beyond a reasonable doubt. Nimley v. Baerwald, No.Civ.A.02-7417, 2004 WL 1171733, at *8 (E.D.Pa. May 26, 2004) (citing Warlick v. Cross, 969 F.2d 303, 306 (7th Cir. 1992); Orsatti v. N.J. State Police, 71 F.3d 480, 482–83 (3d Cir. 1995)). Indeed, the ultimate finding of guilt or innocence, or even dismissal of charges arising out of an arrest and detention has no bearing on whether the arrest was valid. Pansy v. Preate, 870 F. Supp. 612, 617–18 (M.D. Pa. 1994) (citing Pierson v. Ray, 386 U.S. 547, 555 (1967)), aff'd, 61 F.3d 896 (3d Cir. 1995). Rather, "the proper inquiry is . . . whether the arresting officers had probable cause to believe the person arrested committed the offense." Moleski v. Ross, No. Civ.A.09-1111, 2010 WL 2766891, at *4 (E.D. Pa. July 12, 2010) (quotations omitted). The test is an objective one based on the facts available to the officers "at the moment of arrest," rather than in hindsight. Barna v. City of Perth Amboy, 42 F.3d 809, 819 (3d Cir. 1994). Furthermore, whether the arresting officer acts in good faith or in bad faith in effectuating the arrest is irrelevant. Whren v. United States, 517 U.S. 806, 813–14 (1998). Notably, the existence of probable cause in a § 1983 action is generally a jury question. Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 788 (3d Cir. 2000). In appropriate cases, however, a court may conclude that probable cause existed as a matter of law if the evidence, viewed most favorably to the plaintiff, reasonably would not support a contrary factual finding. See Sherwood v. Mulvihill, 113 F.3d 396, 401 (3d Cir. 1997).

In the current case, Plaintiff's relies on a Pennsylvania Supreme Court case,

8

Commonwealth v. Banks, 658 A.2d 752 (Pa. 1995).  In Banks, the court found that "mere police observation of an exchange of an unidentified item or items on a public street corner for cash (which alone does not establish probable cause to arrest) cannot be added to, or melded with the fact of flight (which alone does not establish probable cause to arrest) to constitute probable cause to arrest." Id. at 753.  Banks is notable, Plaintiff contends, because it is part of the Philadelphia Police Department's curriculum on probable cause, and the case is specifically mentioned in the curriculum's written material.  (Pl.'s Mem. Supp. Summ. J. 10.)  Plaintiff claims that the facts of this case are identical to those described in Banks, and the officers were specifically trained to learn that an exchange of an unidentified item followed by flight is insufficient probable cause for arrest.

As Defendants point out, however, it is unclear from the record that Officers Walsh and Vandermay only saw an unknown item pass between individuals.  The Officers stated in depositions and in their written statements that, as members of a narcotics enforcement team, they had reason to believe from experience that the exchange witnessed was a hand-to-hand drug transaction.  (Officers' Statements.)  Additionally, Sergeant Armstrong stated that he observed Kahlif discard a pill bottle before fleeing from the officers.  The court in Banks noted that it was "not a case where a trained narcotics officer observed either drugs or containers commonly known to hold drugs being exchanged." Id. at 455.  The officers in the current case, however, were members of a narcotics enforcement team and, thus, were trained narcotics officers.  Thus, though the facts of the case are similar to those in Banks, Banks was itself a close case that fell "narrowly short of establishing probable cause." Id. at 456.  As such, the additional facts that the officers were trained narcotics officers and that they observed a discarded pill bottle are

9

enough to distinguish the case from Banks. A reasonable jury could find probable cause to exist in this case. As such, Plaintiff's Motion is denied as to the false arrest claim.

### B. Excessive Force

Plaintiff next moves for Summary Judgment on its excessive force claim. Plaintiff claims that Officer Shaw's use of the TASER on Kahlif and Officer Vandermay's grabbing of Kahlif's throat were excessive under the circumstances of the arrest.

Beyond the prohibition on unlawful arrests, the Fourth Amendment further prohibits the use of unreasonably excessive force when making an arrest. Graham v. Connor, 490 U.S. 386, 394 (1989). The Supreme Court has stated that the "use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." Saucier v. Katz, 533 U.S. 194, 202 (2001) (overruled in non-relevant part by Pearson v. Callahan, 555 U.S. 223, (2009)). In making this determination, the court must evaluate the reasonableness of "a particular use of force . . . from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," while recognizing "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary." Graham, 490 U.S. at 396–97. As the United States Supreme Court has held:

> [T]he "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officer['s] actions are "objectively reasonable" in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation . . . . An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

Id. at 397 (internal citations omitted).

10

Careful attention must be given to the facts and circumstances of each particular case, recognizing that the use of some coercion necessarily inheres in the officer's right to make such an investigatory stop or seizure. Id. at 396. These facts and circumstances include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. The Third Circuit Court of Appeals has included additional factors for consideration, such as "the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997), abrogated on other grounds by Curley v. Klem, 499 F.3d 199 (3d Cir. 2007).

It is well-established that "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.'" Graham, 490 U.S. at 396 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)). "Generally, the force used must rise above the de minimis level in order for a constitutional claim to arise." Nardini v. Hackett, No. Civ.A.00-5038, 2001 WL 1175130, at *6 (E.D. Pa. Sept. 19, 2011). Several federal courts have granted summary judgment to defendants on Fourth Amendment § 1983 excessive force claims based upon a finding that the force applied by the defendant officers was de minimis. See, e.g., Nolin v. Isbell, 207 F.3d 1253, 1258 (11th Cir. 2000) (noting that more than de minimis force is necessary to support a Fourth Amendment violation); Foster v. David, No. Civ.A.04-4829, 2006 WL 2371976, at *7 (E.D. Pa. Aug. 11, 2006) (pushing plaintiff out of a doorway to execute a valid search warrant was not excessive force); Garcia v. Cnty. of Bucks, 155 F. Supp. 2d 259, 264–65 (E.D. Pa. 2001) (dismissing Fourth Amendment excessive

11

force claim upon finding that grabbing plaintiff's coat and arms and handcuffing him in the course of his arrest was a de minimis use of force, and therefore not a violation of the Fourth Amendment); Bensinger v. Mullen, No. Civ.A.99-1771, 2000 WL 1100781, at *2 (E.D. Pa. Aug. 4, 2000) (finding that where force used by police in effectuating arrest and injuries sustained by plaintiff therefrom were de minimis, the Fourth Amendment was not violated as a matter of law). Nonetheless, the minor degree of a plaintiff's injury, while relevant to the totality of the circumstances, cannot on its own act as a complete defense to an excessive force claim. Smith v. Mensinger, 293 F.3d 641, 649 (3d Cir. 2002); Herrera v. City of New Brunswick, No. Civ.A.08-3002, 2008 WL 305275, at *5 (D.N.J. Feb. 1, 2008). Notably, the court should be careful to not conflate a false arrest violation with an excessive force violation. Robinson v. Fetterman, 378 F. Supp. 2d 534, 544 (E.D. Pa. 2005) (citing Bodine v. Warwick, 72 F.3d 393, 400 & n.10 (3d Cir. 1995)).

In the current case, Plaintiff claims that Officer Shaw's use of the TASER on Kahlif four times in forty-five seconds was excessive under the circumstances, as was Officer Vandermay's grabbing Kahlif's throat in an attempt to force him to spit out the bag he swallowed. Plaintiff contends that Kahlif remained relatively still and was not a physical threat to the officers. (McNicholas Dep. 33:1-4.) Plaintiff also points out that Kahlif was unarmed at the time and the none of the officers indicated at the scene that they believed he had a weapon. (Id. at 17-20.)

Defendants counter by pointing out that Kahlif was struggling with the Officers, that he would not comply with their requests to get him handcuffed, and that they did not know if he had a weapon. (Walsh Dep. 74:1–12; McNicholas Dep. 38:3–11.) Officer McNicholas claims that the TASER was used because Kahlif was not complying with their requests and states that,

12

though he did not believe Kahlif was a direct threat at the time, there was a concern that he would begin struggling and fighting again with the officers. (McNicholas Dep. 38:12–18.) Additionally, Officer Shaw allegedly announced to Kahlif that he was going to deploy the TASER before doing so. (Id. at 39:19–23.)

Under the circumstances and taking the facts in a light most favorable to the Defendants, a reasonable jury could find that the use of force by the officers was reasonable. The TASER was used before Kahlif stopped breathing, and the testimony suggests that he was struggling and potentially a threat. The Court is cognizant of the fact that Kahlif is unable to testify himself and that the only witnesses to the incident are the Defendant officers. Cf. Lamont v. New Jersey, 637 F.3d 177, 181-182 (3d Cir. 2011) (noting that, in the context of a deadly force case, a court should be cautious to ensure that officers are not taking advantage of the fact that the person most likely to contradict their testimony—the victim—is unable to testify). Because, however, there are potential issues of fact such that a reasonable jury could find the officers actions were reasonable, Plaintiff's motion must be denied.[2]

### C. Qualified Immunity

Defendants contend they are entitled to qualified immunity on Count V, inadequate medical care of a detainee. Qualified immunity provides that government officials are immune from suits for civil damages under 42 U.S.C. § 1983 "insofar as their conduct does not violate

---

[2]Defendant's motion to remove Sergeant James Morace on this count is similarly denied. Defendants argue that Sergeant Morace did not arrive on the scene until after the TASER device was used and Kahlif was handcuffed. Plaintiff responds that Sergeant Morace's continued acquiescence to use of handcuffs on Kahlif while he was unresponsive and being transported to the hospital was excessive. As it is unclear whether a reasonable jury taking all facts in favor of Plaintiff could find for Defendant, Defendant's motion is denied.

13

clearly established statutory or constitutional rights of which a reasonable person would have known." Messerschmidt v. Millender, 132 S. Ct. 1235, 1244 (2012) (quotations omitted). This doctrine attempts to balance the competing values of protecting innocent individuals from litigation while allowing liability for those who abuse their discretion. Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982). The qualified immunity analysis is specific to each individual defendant and considers the totality of the circumstances at the time of the defendant's challenged conduct. Curley v. Klem, 499 F.3d 199, 207 (3d Cir. 2007).

The qualified immunity inquiry is a question of law consisting of two prongs to be considered in any order. Pearson v. Callahan, 555 U.S. 223, 232 (2009). The first question is "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." Id. at 232 (internal citation omitted). The second inquiry asks "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Id. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'. . .We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). "This inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." Pearson, 555 U.S. at 244 (internal quotation marks omitted). The court must consider "the information within the officer's possession at that time." Harvey v. Plains Twp. Police Dep't, 421 F.3d 185, 194 (3d Cir. 2005) (citing Anderson, 483 U.S. 635).

Case 2:11-cv-05041-RB   Document 25-2   Filed 10/04/12   Page 15 of 19

Assuming for purposes of this motion only that prong one is met and Kahlif was deprived of his constitutional rights, qualified immunity still attaches because it is not beyond dispute that reasonable officers in the position of those at this incident would know that their actions were clearly unlawful. Plaintiff argues that the officers' actions violated Kahlif's constitutional rights because they failed to provide adequate medical care as required by their training. Specifically, Plaintiff notes that the officers failed to (1) check for obstructions in the mouth and throat and (2) remove any obstructions or perform abdominal thrusts to dislodge anything in the mouth and throat. (Pl.'s Mem. Supp. Summ. J. 18.) Additionally, Plaintiff highlights that the officers transported Kahlif to the hospital in the back seat of their vehicle while handcuffed.

Assuming *arguendo* that these actions were a violation, there is no evidence that they were unconstitutional beyond debate and that every reasonable officer would recognize them as such. While there is no question that the officers could have provided better medical care by, at a minimum, checking Kahlif's airway for obstructions, the high standard to overcome qualified immunity has not been met. The contours of the officer's duties, particularly in this hyperpressurized situation, were not so sufficiently clear that every reasonable officer—even one with training in CPR—would have understood that a failure to check a non-breathing person's airway violates his Constitutional rights. Similarly, the transportation of Kahlif to the hospital while handcuffed falls short of being a clearly established constitutional violation such that every reasonable officer would have recognized it as a violation.

Moreover, neither party has cited a case and this Court is unaware of one in which there are sufficiently analogous facts and in which a court has found a constitutional violation. Though the Supreme Court in <u>Ashcroft v. al-Kidd</u> noted that there need not be a case directly on

point, Plaintiff has not demonstrated that existing precedent places this Constitutional question beyond debate. As such, the officers are entitled to qualified immunity on this claim. In turn, Defendants' Motion for Summary Judgment is granted and Plaintiff's Motion is denied on Count V.

### D. Municipal Liability

In the seminal case of Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), the United States Supreme Court confirmed that "Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies," but emphasized that, "a municipality cannot be held liable under § 1983 on a respondeat superior theory." Id. at 690–91 (emphasis in original). To establish section 1983 liability on such a governing body, the plaintiff must identify either a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." Id. A policy is shown when "a 'decisionmaker possessing final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (quoting Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990)). A custom is defined as "'such practices of state officials so permanent and well-settled as to constitute law,'" which can be established by showing the policy maker's knowledge and acquiescence to the custom. Id. (quoting Andrews, 895 F.2d at 1480). Alternatively, a custom or policy may be established from a failure to train, supervise, or otherwise act, where that failure reflects a deliberate indifference of officials to the rights of persons that come into contact with

16

these municipal employees. City of Canton v. Harris, 489 U.S. 378, 388 (1989); Reitz v. Cnty. of Bucks, 125 F.3d 139, 145 (3d Cir. 1997). As succinctly summarized by the Third Circuit, three situations exist where acts of a government employee are deemed to be the result of a policy or custom of the governmental employer, thereby rendering the entity liable under § 1983:

> The first is where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy. . . . The second occurs where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself. . . . Finally, a policy or custom may also exist where the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.

Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003) (internal quotation marks and citations omitted).

Beyond identification of a policy or customary failure to act, establishment of section 1983 municipal liability requires a showing of causation. "[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality." Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 404 (1997). Rather, the plaintiff "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Id.; see also Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990) (plaintiff carries burden of demonstrating a "plausible nexus" or "affirmative link" between the municipality's custom or policy and the constitutional deprivation challenged). The standard of causation is stringent and requires that "the identified deficiency . . . be closely related to the ultimate injury." Canton, 489 U.S. at 391.

17

Defendants argue that Snowden has not provided evidence of the City's failure to train its officers or other policies or customs in effect that lead to the use of excessive force, stops without probable cause, or inadequate medical treatment of detainees. In response, Plaintiff points to a number of alleged violations of the City's policies. First, Plaintiff cites a number of alleged violations of the City's TASER policy by Officer Shaw. Secondly, Plaintiff points to Officer Vandermay's alleged use of excessive force by grabbing Kahlif's throat. Finally, Plaintiff references the City's failure to initiate an internal affairs investigation of the incident until after the current lawsuit was filed and over five months after the incident. Plaintiff argues that these examples indicate a policy or custom of the City of excessive force.

These alleged examples are not enough to demonstrate that there is a widespread policy or custom of excessive force by the Philadelphia Police Department. First, Plaintiff has not pointed to any allegedly excessive action the officers took during the incident that was done pursuant to an official practice of City. Second, Plaintiff has not pointed to any violation of Constitutional law by the policymaker itself—in this case the Police Commissioner. Finally, the Plaintiff's proffered examples are not enough to demonstrate that the City was deliberately indifferent to its officers' use of excessive force. The individual actions of Officer Shaw using his TASER and Officer Vandermay grabbing Kahlif's throat alone are insufficient to demonstrate that the City should have been aware of a widespread custom of excessive force. Similarly, the inaction of the Department to conduct an investigation until after five months had passed by itself is not the type of action that clearly demonstrates that the City was deliberately indifferent to its officers widespread use of excessive force.

Additionally, Plaintiff has not demonstrated any policies or customs of the Philadelphia

Police Department that led to City officers stopping suspects without probable cause or providing inadequate medical treatment. As a result, the Court grants Defendants' Motion for Summary Judgment on all claims against the City of Philadelphia.

## IV.     CONCLUSION

In light of the foregoing, the Court finds that summary judgment is warranted in part, but not on the entirety of this matter. Plaintiff's Motion for Summary Judgment for false arrest and excessive force fails because the facts are not such that a reasonable jury taking all inferences in favor of Defendants could only find for Plaintiff. Defendant's Motion is granted on Count V because the Court cannot find that a reasonable officer faced with the circumstances before the Defendants would have understood that the failure to check Plaintiff's airways before beginning chest compressions violated a clearly established constitutional right. Defendant's Motion is granted as to all claims against the City of Philadelphia because Plaintiff has not met its burden to provide evidence of a widespread policy or custom within the City that led to officers making false arrests, using excessive force, providing inadequate medical care to detainees, or any other Constitutional violation. Finally, Defendant's Motion to dismiss all claims against Sergeant Morace is denied, as a reasonable jury could potentially still find that he used excessive force.

An appropriate Order follows.